IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

BRIAN WILSON,                          )
                                       )
                    Plaintiff,         )
                                       )
        v.                             )        Case No. 06-3040-CV-S-REL-SSA
                                       )
LINDA MCMAHON, Acting                  )
Commissioner of Social                 )
Security,                              )
                                       )
                    Defendant.         )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Brian Wilson seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that (1) the ALJ erred in discrediting the opinions of plaintiff's treating physicians, Dr. McQueary and Dr. Ball; (2) the ALJ relied on an improper hypothetical question to the vocational expert; and (3) the ALJ failed to properly analyze plaintiff's credibility. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.      BACKGROUND

On May 31, 2002, plaintiff applied for disability benefits. That application was denied on September 17, 2002. Plaintiff filed a second application for disability benefits on August 15, 2003, alleging that he had been disabled since August 5, 2003. Plaintiff's disability stems from degenerative disc disease of the lumbar spine with evidence of disc protrusion, status post right L5-S1 discectomy, scoliosis, and thoracic outlet syndrome bilaterally. Plaintiff's application was

denied on October 6, 2003. On July 8, 2004, a hearing was held before an Administrative Law

Judge. On August 17, 2004, the ALJ found that plaintiff was not under a "disability" as defined

in the Act. On September 30, 2004, the Appeals Council denied plaintiff's request for review.

Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final

decision" of the Commissioner. The standard for judicial review by the federal district court is

whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. §

405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-

51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100

F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is

supported by substantial evidence requires review of the entire record, considering the evidence

in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v.

NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The

Court must also take into consideration the weight of the evidence in the record and apply a

balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th

Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales,

402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the

substantial evidence standard presupposes a zone of choice within which the decision makers can

go either way, without interference by the courts. "[A]n administrative decision is not subject to

Case 6:06-cv-03040-REL   Document 20   Filed 01/29/07   Page 2 of 44

reversal merely because substantial evidence would have supported an opposite decision." Id.;

Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

       Yes = disabled.
       No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

       No = not disabled.
       Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

       Yes = disabled.
       No = not disabled.

## IV.  THE RECORD

The record consists of the testimony of plaintiff and vocational expert Terri Crawford, in addition to documentary evidence admitted at the hearing.

## A.  EARNINGS RECORD

The record establishes that plaintiff earned the following income from 1989 through 2004:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1989 | $ 1,736.14 | 1997 | $ 8,863.58 |
| 1990 | 4,022.00 | 1998 | 21,901.63 |
| 1991 | 6,061.45 | 1999 | 16,145.29 |
| 1992 | 7,821.19 | 2000 | 14,313.36 |
| 1993 | 11,079.31 | 2001 | 19,470.65 |
| 1994 | 10,921.36 | 2002 | 19,884.41 |
| 1995 | 12,444.95 | 2003 | 0.00 |
| 1996 | 9,018.85 | 2004 | 0.00 |

4

(Tr. at 102-103).

**B.     SUMMARY OF MEDICAL RECORDS**

On May 16, 2002, plaintiff saw Fred McQueary, M.D., an orthopedic surgeon (Tr. at 176-177, 184).  Plaintiff complained of progressive pain down his left leg for the last three months. Dr. Hill had placed him on light duty at work.  He had two jobs, one was washing trucks and the other was working as a tire installer at a tire shop.  Plaintiff reported he smokes two packs of cigarettes daily and has for a long time.[1]  Dr. McQueary observed that plaintiff walked in a forward-flexed position.  Plaintiff had moderate paravertebral muscle spasm, range of motion was significantly restricted due to spasm.  Dr. McQueary reviewed plaintiff's MRI that had been done on April 24, 2002, and noted a focal left L5-S1 disc herniation[2] with left S1 nerve root compression[3].  He assessed L5-S1 disc herniation with left S1 radiculopathy[4].  Dr. McQueary discussed plaintiff's options, including surgery, and plaintiff stated that his pain was bad enough that he would like to proceed with surgical intervention as soon as practical.

On May 31, 2002, plaintiff filed his first application for disability benefits.

---

[1]This sentence regarding plaintiff's smoking was typed in bold on Dr. McQueary's report.

[2]As a disc degenerates (wears away), it can herniate (the inner core extrudes) back into the spinal canal, which is known as a disc herniation (or a herniated disc). The weak spot in a disc is directly under the nerve root, and a herniated disc in this area puts direct pressure on the nerve, which in turn can cause pain to radiate all the way down the patient's leg to the foot.

[3]Pinching of a nerve by putting too much pressure on it.

[4]Pain and other symptoms like numbness, tingling, and weakness in the arms or legs that are caused by a problem with the nerve roots.

5

On June 5, 2002, plaintiff was admitted to St. John's Mercy Hospital and underwent an L5-S1 discectomy[5]. Postoperatively, he reported no leg pain. By the second day after surgery, he was able to ambulate throughout the halls without difficulty and he reported no leg pain. Plaintiff was discharged with a prescription for Lorcet Plus[6]. He was told to follow up with Dr. McQueary in four weeks, and in the meantime he should do no bending, lifting, or twisting. (Tr. at 195-202).

On July 16, 2002, plaintiff saw Fred McQueary, M.D. (Tr. at 228). Plaintiff was doing much better than preoperatively. He was given a "Back Basics" booklet and told to begin back a exercise program and a good back care program. "He has not made any progress about quitting smoking. I again strongly advised him to try to get all the way off of the cigarettes." Plaintiff was released to return to work with a 20-pound lifting restriction.

On July 30, 2002, plaintiff saw Jeffrey DelVecchio, a physicians assistant in Dr. McQueary's office (Tr. at 228). Plaintiff continued to experience some pain extending down the left buttock and posterior calf. "He reports that he continues to smoke. He has not done any exercises from the book he was given 4 weeks ago by Dr. McQueary, and has been working and lifting more than his work restriction of 20 pounds. He states that he 'does not know what a 20 pound lifting restriction is.'" Plaintiff was kept off work for four weeks and then was to start an "aggressive physical therapy program". "Plaintiff was again encouraged to refrain from nicotine

_____

[5]A discectomy is a surgery done to remove a herniated disc from the spinal canal. When a disc herniation occurs, a fragment of the normal spinal disc is dislodged. This fragment may press against the spinal cord or the nerves that surround the spinal cord. This pressure causes the symptoms that are characteristic of herniated discs.

[6]Hydrocodone (a narcotic analgesic) and acetaminophen (Tylenol) combined.

to allow healing of his back."

On August 8, 2002, plaintiff was seen by Ellen Brown, physical therapist (Tr. at 223-224). Plaintiff reported that he had returned to work two weeks ago with a 20-pound weight limit, but he works in a tire shop and was lifting weights greater than 20 pounds. Plaintiff was having increased pain that was very similar to what he had before surgery, but less intense. Plaintiff was off work until he returned to see his doctor on August 27, 2002. Plaintiff was taking no medications because his pain medicine was making him sick. "Plaintiff would benefit from lumbar stabilization and instruction on proper body mechanics. Patient today was provided with home exercise program including lumbar stabilization and postural stabilization." Long term goal was listed as being able to demonstrate proper body mechanics lifting 50 to 100 pounds. His physical therapy was scheduled to last six weeks.

On August 9, 2002, plaintiff had physical therapy (Tr. at 220). He reported his pain was the same, about a 2/10. He was doing his home exercises at least twice a day. He continued to have pain in his left leg in the calf. After physical therapy, plaintiff had no pain while in prone position, but his pain returned with sitting.

On August 13, 2002, plaintiff had physical therapy (Tr. at 219). He reported his pain as a 2/10. He reported no problems with his home exercise plan. "States he's able to keep pain under control." Plaintiff's pain increases to a 3-4/10 with ambulation, eases back down when in prone position.

On August 15, 2002, plaintiff had physical therapy (Tr. at 218). He reported he was hurting, and rated his pain as a 5/10. Following treatment he stated that he had no pain and was numb from cryotherapy [ice pack therapy]. Less pain was noted in the left calf.

7

On August 20, 2002, plaintiff failed to show up for his physical therapy appointment (Tr. at 218).

On August 22, 2002, Ellen Brown, physical therapist, wrote a letter to Dr. McQueary. The letter reads as follows: "Patient called on his appointment date of August 22, 2002, and stated that he would like to be discharged from physical therapy secondary to having more pain with the ride to and from his therapy appointments than he does any other time. Patient typically has pain down left lower extremity and rates it as a 3/10 on a scale of 0 to 10. Therapist questioned whether patient was continuing to do home exercise program and he stated that he was. Patient had previously been tested with this and he is independent with home exercises at this time. Patient's long term goals were not met at this time. Patient was scheduled for a doctors appointment with Dr. DelVecchio[7] on 8-27-02. Patient to be discharged from physical therapy at this time secondary to patient's request."

On August 22, 2002, plaintiff saw Jeffrey DelVecchio, a physician's assistant, and Dr. McQueary (Tr. at 227, 241). Plaintiff continued to complain of pain in his left buttock and posterior calf. "He has only gone to a total of 5 therapy visits, and continues to smoke 1 pack of cigarettes per day. Dr. McQueary spoke to the patient today about the importance of back exercises, cardiovascular exercises at least 20 minutes 3 times a week. We also discussed the importance to remain completely abstinence [sic] from nicotine. Dr. McQueary discussed with him the fact that he may need to find a different line of work. He was given Voc Rehab card and recommendations to discuss possible job retraining as well. We will see him back on a prn [as

_____

[7]Jeffrey DelVecchio is a physician's assistant, not a doctor.

8

needed] basis. We will release him to go back to work regular duty on 9/2/02."

On September 17, 2002, plaintiff's first application for disability benefits was denied. He did not appeal that decision.

On December 28, 2002, plaintiff saw Doyle Hill, D.O., for a follow up (Tr. at 189). Plaintiff said he was still sore but feeling better, the only time his back hurt was when he was sitting. Dr. Hill prescribed Celebrex [non-steroidal anti-inflammatory] and Flexeril [muscle relaxer], and under special instructions he wrote "physical therapy appt".

On January 14, 2003, plaintiff saw Michael Ball, D.O. (Tr. at 236). Plaintiff complained that his back had been hurting since his surgery in June 2002. Dr. Ball assessed lumbar strain. He prescribed Naprosyn, a non-steroidal anti-inflammatory.

On January 17, 2003, plaintiff saw Michael Ball, D.O. (Tr. at 236). Plaintiff stated that his back was a little better, and he needed a note saying he could go back to work. The records indicate plaintiff could return to work on January 17, 2003, and an MRI was scheduled for January 22, 2003, at Truman Medical Center.

On January 22, 2003, plaintiff had an MRI of his lumbar spine performed by David Wu, M.D. (Tr. at 281). His impression was central/left paracentral disc protrusion[8] at L5/S1.

On January 31, 2003, plaintiff saw Michael Ball, D.O., for his MRI results (Tr. at 235). Dr. Ball assessed lumbar pain, protruding disc L5-S1. He told plaintiff to take ibuprofen, 800

---

[8]The outer, fibrous ring (annulus fibrosus) of an intervertebral disc surrounds the soft, central portion (nucleus pulposus). Disc protrusion is a condition in which the outermost layers of the annulus fibrosus are still intact, but can bulge when the disc is under pressure.

9

mg[9], and follow up with Dr. McQueary.

On March 21, 2003, plaintiff saw Michael Ball, D.O. (Tr. at 235). Plaintiff stated that he needed something other than ibuprofen which was not working. "Hasn't got in to see McQueary in the recent past as expected." Dr. Ball assessed lumbar strain. He prescribed Cataflam [non-steroidal anti-inflammatory] and Flexeril [muscle relaxer]. The record concludes with "Release 3/21 thru 4/4/03".

On April 10, 2003, plaintiff saw Jeffrey DelVecchio, physicians assistant, and Fred McQueary, M.D. (Tr. at 240). Plaintiff stated that he continued to have back pain, worse with bending or twisting, better with changing positions. Plaintiff had decreased his smoking to 1/2 pack per day, but he continued to smoke on a regular basis. Plaintiff had moderate spasm of the lumbar spine. MRI scan done on January 22 was reviewed and demonstrated disk desiccation[10] and mild narrowing at L5-S1. There was no significant neurologic compression, no signs of recurrent disk herniation. Dr. McQueary's impression was, "Brian has a strain injury to his low back. He very well may have re-injured his L5-S1 level of herniation." The plan is listed as follows: "I do not feel that he is a surgical candidate for this. I feel that this would best be treated conservatively. He was given a 'Back Basics' booklet again, and told to begin back exercise there and to get back on a regular cardiovascular exercise program, as well. He was

_____

[9]One over-the-counter ibuprofen is 200 mg.

[10] Vertebrae are bones that form an opening in which the spinal cord passes. These bones are stacked one on top of another. In between the vertebrae are flat, cushiony discs (known as intervertebral discs) that act as shock absorbers. The discs normally contain a certain amount of fluid. Disc desiccation is abnormal dryness of the discs. As a result of this dryness and loss of fluid, the disc(s) degenerate (wear away) to a degree. Disc desiccation is the earliest visible sign of disc degeneration.

Case 6:06-cv-03040-REL    Document 20    Filed 01/29/07    Page 10 of 44

provided with a 'Road to Freedom' brochure and he was strongly encouraged to get all the way off the cigarettes. Since he is not a surgical candidate at this point, he will refer with Dr. Ball for additional pain control measures."

On July 11, 2003, plaintiff saw Michael Ball, D.O., for lower back pain for the previous five days (Tr. at 234). Dr. Ball assessed lumbar strain and prescribed Vicodin[11] and Vioxx (a non-steroidal anti-inflammatory).

On July 22, 2003, plaintiff was seen at the Texas County Memorial Hospital complaining of low back pain (Tr. at 282-285). He stated that the pain was better with remaining still and was worse with movement. Straight leg raising was negative bilaterally. The doctor assessed acute low back pain and acute sciatica[12], right leg.

On July 25, 2003, plaintiff had an x-ray of the lumbar spine performed by Qasim Bajwa, M.D. (Tr. at 284). The x-ray was negative.

On August 4, 2003, plaintiff saw Michael Ball, D.O., for lower back pain and a knot on his right wrist (Tr. at 234). Plaintiff reported that he was in a car accident seven years earlier and he injured his neck which has hurt ever since. Dr. Ball ordered an x-ray of the cervical spine and right wrist. He assessed ganglion cyst on the right wrist, wrist pain, and cervical pain. He recommended that plaintiff follow up with Dr. McQueary.

August 5, 2003, is plaintiff's alleged onset date.

---

[11]Vicodin is a combination of hydrocodone (a narcotic analgesic) and acetaminophen (Tylenol).

[12]Sciatica is a pain in the leg caused by the irritation of the sciatic nerve.

On August 7, 2003, plaintiff saw Fred McQueary, M.D., at the request of Dr. Ball (Tr. at 239). "He indicates that Dr. Ball did not even see him. Dr. Ball did not even discuss with him the possibility of seeing a physiatrist[13], as I had outlined in my previous letter. The patient states that his back pain has gotten worse. It is still in the same area as before. It is all in his back. He does not have any significant radicular pain. He has quit his job. He continues to smoke. He anticipates applying for Social Security Disability." On exam, plaintiff had significant spasm in his back. "My impression of this is unchanged from previously. I feel that the most appropriate place for this patient to be seen is through physiatry, rather than have Dr. Ball set this up for him, we will proceed with that for him and try to speed things up for him that way. He was given samples for Bextra [non-steroidal anti-inflammatory] and Flexeril [muscle relaxer] in our office today. We gave him an off work slip for three months. I have suggested that he continue working with Dr. Ball on additional pain control measures and additional medications. I would support his application for Social Security Disability, as I do not feel that there are other surgical options that we could offer him. Things have certainly not changed sine he was last seen. I have instructed the patient to work with Dr. Ball on smoking cessation, as well. Unfortunately, there is nothing else that we can offer him treatment wise."

On August 15, 2003, plaintiff filed his application for disability benefits alleging the August 5, 2003, onset date.

On August 22, 2003, plaintiff was seen at Family Walk-in Clinic of Mountain Grove (Tr. at 247, 248). Plaintiff complained of neck pain and pain and swelling in his right wrist and hand.

---

[13]A physician specializing in physical medicine and rehabilitation.

Plaintiff's grips were equal. A lump was felt on the right wrist, plaintiff had pain in the upper back and at the base of the neck. Geneva Kilgore, a nurse practitioner, assessed muscle spasms and proscribed Soma [muscle relaxer] and Ultracet [pain reliever]. She ordered an x-ray of plaintiff's neck and wrist and an MRI of his cervical and lumbar spine.

On August 23, 2003, plaintiff was seen at Texas County Memorial Hospital complaining of neck pain (Tr. at 288-289, 291-295). The doctor noted vertebral tenderness in the C6-C7 area, and vertebral tenderness in the lower lumbar area. He assessed chronic neck pain and told plaintiff to continue taking his Ultracet, stop the Soma, and he prescribed Vicodin. He also told plaintiff to follow up with his primary care physician.

On August 25, 2003, plaintiff had an x-ray of his cervical spine, performed by Qasim Bajwa, M.D. (Tr. at 290). The x-ray was negative.

On September 6, 2003, plaintiff had an MRI of the cervical and lumbar spine (Tr. at 242-244). Plaintiff's cervical spine was normal. Impression was as follows:

1.  L5-S1 left side laminectomy defect with what appears to be a 4 mm disc protrusion on pre contrast scans that lateralizes to the left and impingement is upon the left S1 nerve root. However, post contrast administration most of this abnormal signal enhances consistent with epidural scar around the left thecal sac and left S1 nerve root at L5-S1. There is a 3 mm disc protrusion at L4-5 and a minimal 2 mm disc protrusion at L3-4.

2.  Multiple Schmorl's nodes[14].

3.  Dissection and mild narrowing of L5-S1.

_____

[14]Schmorl's nodes are defined as herniations of the intervertebral disc through the vertebral end-plate.

Case 6:06-cv-03040-REL   Document 20   Filed 01/29/07   Page 13 of 44

On September 10, 2003, plaintiff was seen by David Stone, M.D., at Family Walk-in Clinic of Mountain Grove to review his MRI results and get refills on his medication (Tr. at 245, 246). "C[ervical] spine negative, LS [lumbosacral] spine consistent with degenerative changes and prior surgery." Plaintiff described numbness in his 4th and 5th fingers and decreased grip, positive history of repetitive strain to hands and wrists from work. Borderline positive Phalen's test[15]. The doctor assessed early carpal tunnel syndrome, bilaterally. He recommended a nerve conduction study.

On September 22, 2003, plaintiff saw David Stone, M.D., at the Family Walk-in Clinic to review the results of his MRI (Tr. at 315). Cervical spine was within normal limits but plaintiff continued to complain of pain. His lumbar spine MRI was positive "only for old changes, no acute". Dr. Stone advised plaintiff to go to a physiatrist for further treatment "such as TENS unit[16], acupuncture, etc." Dr. Stone assessed chronic neck pain and prescribed Tramadol [pain reliever] and Trazodone [anti-depressant] for pain. Dr. Stone wrote a physiatry referral and wrote "Pt. has to arrange when he'll have transportation first."

---

[15]Phalen's Maneuver is a diagnostic test for carpal tunnel syndrome. The patient is asked to hold his wrist in complete and forced flexion (pushing the dorsal surfaces of both hands together) for 30 to 60 seconds. This maneuver moderately increases the pressure in the carpal tunnel and has the effect of pinching the median nerve between the proximal edge of the transverse carpal ligament and the anterior border of the distal end of the radius. By compressing the median nerve within the carpal tunnel, characteristic symptoms (such as burning, tingling or numb sensation over the thumb, index, middle and ring fingers) conveys a positive test result and confirms carpal tunnel syndrome.

[16]T.E.N.S. is an acronym for Transcutaneous Electrical Nerve Stimulation. With the development of modern medicine doctors and scientists have perfected the use of electric pulses to treat and eliminate pain. A TENS unit is a device that transmits small square electrical pulses to the electrodes, which transmit this electrical pulse to the underlying nerves.

14

On October 2, 2003, a physician with Disability Determinations completed a Physical Residual Functional Capacity assessment (Tr. at 249-256). The doctor found that plaintiff could occasionally lift 20 pounds, frequently lift ten pounds, stand or walk for at least two hours per day, sit for a total of six hours per day, and was limited in his ability to push or pull with his upper extremities. The doctor found that plaintiff could occasionally climb, stoop, crouch, and crawl, and that he could frequently balance and kneel. He had no manipulative limitations (such as reaching, handling, fingering, and feeling), no visual limitations, and no communicative limitations. He should avoid concentrated exposure to extreme cold, vibration, and hazards such as machinery and heights.

On October 6, 2003, plaintiff's application for disability benefits was denied.

On October 16, 2003, plaintiff saw David Stone, M.D., at the Family Walk-in Clinic complaining of pain in his back between his shoulder blades (Tr. at 316). Dr. Stone discussed with plaintiff the negative results of his cervical spine MRI and advised him to consider physical therapy and a TENS unit. "He requests standard x-ray of t-spine and was advised to see Dr. Dugan for this in Mansfield as well as to discuss pain management." Dr. Stone assessed chronic back strain. He wrote under treatment: "x-ray T-spine, suggest physical therapy and TENS, see Dr. Dugan for therapy, any narcotic analgesics".

On October 18, 2003, plaintiff saw David Stone, M.D., at the Family Walk-in Clinic to go over his x-rays (Tr. at 317). The x-rays of plaintiff's thoracic spine were normal, "some rotation noted otherwise appears WNL [within normal limits] for age." Dr. Stone again advised plaintiff to try physical therapy and a TENS unit.

15

On October 26, 2003, plaintiff had an MRI of his thoracic spine performed by Jason

Davis, M.D. (Tr. at 297). Dr. Davis's impression was minor disc bulge T8-9 without evidence of

significant neural encroachment. There was no evidence of a compression fracture or other

acute abnormality on MRI.

On October 31, 2003, plaintiff was seen at the Family Walk-in Clinic to go over MRI

results and to get medications changed because one was making him sick to his stomach (Tr. at

318). The doctor noted that plaintiff had not had physical therapy yet. The doctor prescribed

Celebrex.

On November 7, 2003, plaintiff saw Geneva Kilgore, a nurse practitioner at the Family

Walk-in Clinic "to go over MRI results. He does not understand results." Plaintiff said he was

concerned about Schmorl's node. He was told a doctor would call him later and explain.

Plaintiff said he would research it.

On November 26, 2003, plaintiff was seen by Geneva Kilgore, a nurse practitioner at the

Family Walk-in Clinic (Tr. at 320). He stated that he was having back pain and wanted refills

on his medications. He stated that he was having no relief of back pain with Celebrex. Plaintiff

obtained prescriptions for Ultram [pain reliever], Robaxin [muscle relaxer], and a Lidoderm

patch [numbs the skin].

On December 16, 2003, plaintiff saw Michael Ball, D.O., for back pain (Tr. at 260). Dr.

Ball assessed lumbar pain, bulging discs at L4 and L5. He prescribed Celebrex and Vicodin.

On December 29, 2003, plaintiff saw Michael Ball, D.O. (Tr. at 260). Plaintiff

complained that he slept on his back wrong and woke up with pain. "No pain like this in a long

time." Dr. Ball assessed thoracic pain and prescribed Relafen [non-steroidal anti-inflammatory]

and Vistaril[17].

On January 12, 2004, plaintiff saw Michael Ball, D.O. (Tr. at 261). Plaintiff complained of back pain, and said his medications were not working. Dr. Ball assessed lumbar pain and requested a surgical consult.

On January 21, 2004, plaintiff saw David Kent, M.D. (Tr. at 336-347). Plaintiff was described as a "moderately-built, muscular young man." Dr. Kent observed that plaintiff moved careful from sitting to standing position, "however, he does not really appear to have any difficulties with his motor power. He waits for specific instructions and moves in a pretty guarded fashion with some minimal exaggeration, actually, of his pain responses." Plaintiff was somewhat tender through the thoracic and lumbar paraspinals[18], had a lot of tenderness over the right sacroiliac joint[19], the lumbar spine itself, and out into the soft tissues of the right buttock. "We really did not get a positive parasthesia[20] down into the right leg with palpation deep into the sciatic notch but he was complaining of pain and soreness right down the back of his right leg today to about the level of the knee. His lower extremity strength and reflexes were well-preserved. He was able to heel and toe walk." Dr. Kent's impression was low back sprain and

---

[17]Depresses activity in the central nervous system (brain and spinal cord), which causes relaxation and relief from anxiety.

[18]The muscles next to the spine are called the paraspinal muscles. They support the spine and are the motor for movement of the spine.

[19]The sacroiliac joint is the joint between the sacrum (the tail bone) and the ilium of the pelvis (the hip bone), which are joined by ligaments.

[20]Paresthesia refers to a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet, but can also occur in other parts of the body. The sensation, which happens without warning, is usually painless and described as tingling or numbness, skin crawling, or itching.

17

lumbar spondylosis[21] without any true radicular pattern apparent. "We question the possibility of a facet syndrome[22] on the right, myofascial paraspinal pain and possible bilateral thoracic outlet syndrome[23]." Dr. Kent ordered cervical and thoracic spine x-rays and "sent him over to see the physical therapist here at the Spine Center today and have asked for her to evaluate him and give him some home stretching and an exercise program targeted at lumbar flexibility. We also suggested a trial of soft cervical collar that he could try during the day, just for comfort." Plaintiff was told to stop taking the Skelaxin since he was not sure of its benefit. His Ultram was increased, and he was told to use his Lidoderm patches. Finally, he was prescribed Elavil at night for pain and to help him sleep. Plaintiff's cervical x-rays were normal. Thoracic x-rays were normal except "minimal degenerative change" was present.

---

[21]Spondylosis (spinal osteoarthritis) is a degenerative disorder that may cause loss of normal spinal structure and function.

[22]Facet Syndrome of the back occurs when the back of the spine which interconnects to one another (the facets) compresses and irritates the soft tissue in between. This can inflame the nerves exiting the spine and cause the same type of symptoms commonly seen with pinched nerve conditions. When a nerve is compressed, it may cause symptoms of numbness, tingling, burning and achy soreness along the nerve path. Extension of the spine will exacerbate Facet Syndrome, as the back of the joints will be pushed closer together. As flexion of the spine will often alleviate the symptoms of Facet Syndrome, part of a normal treatment regiment should include flexion exercises to take the pressure off the back of the vertebrae.

[23]Thoracic outlet syndrome consists of a group of distinct disorders that affect the nerves in the brachial plexus (nerves that pass into the arms from the neck) and various nerves and blood vessels between the base of the neck and axilla (armpit). For the most part, these disorders are produced by positional compression of the subclavian artery and vein, the vertebral artery, and the nerve cords of the brachial plexus. The disorders are complex, somewhat confusing, and poorly defined, each with various signs and symptoms not only arising from the upper extremity but also from the chest, neck and head. The chest pain can mimic anginal pain.

18

That same day, plaintiff saw Jeff Potts, physical therapist, at the request of David Kent, M.D. (Tr. at 334-335). Plaintiff was presented with a soft cervical collar but chose not to take the collar. Plaintiff was shown stretching exercises to do at home and was discharged from physical therapy.

On January 28, 2004, plaintiff returned to see David Kent, M.D. (Tr. at 357-359). He stated he saw no improvement. He reported that at home he does very little. "He has been attending physical therapy yet finds that is minimally helpful. . . . There is no pool available where he is going to the Mountain Grove/West Plains area, at least where he can access, and is finding that physical therapy and working on myofascial techniques, shoulder/neck stretch, and lumbar flexibility, etc., is not really providing significant relief either. . . . [N]o paresthesias in the four extremities, no joint swelling, no other muscle pain new. . . . [I]s without any complaints about falls or other trauma." On exam, plaintiff had minimal soft tissue about the shoulder and neck on the right with some tender interscapular pain which was "quite minimal." He had tenderness in the lumbar paraspinals, but more so about the sacroiliac regions and L5-S1 region of the low back. "We have a patient with mechanical low back pain, subtle sprain/strain like origin likely but no other true etiology seen. He has some mild myofascial pain, too, in the interscapular regions bilaterally with a questionable bilateral thoracic outlet." Dr. Kent increased Baclofen, added Neurontin and Trazodone, and told plaintiff to continue the Elavil. "[C]ontinue sending him on to physical therapy also to work not only on the mechanical low back pain and flexibility but probably release some of the thoracic outlet soft tissue tightness that may be present, though there is again minimal tenderness on today's exam, even in the pectoral regions with no tenderness over the supra nor interscapular regions bilaterally."

19

On February 11, 2004, plaintiff saw David Kent, M.D. (Tr. at 362-364). Portions of Dr. Kent's report read as follows:

> INITIAL EVALUATION:
> . . . [H]e feels that physical therapy working on electrical stimulation, massage and stretching of his shoulder, neck and intrascapular stabilizers is really not very effective. However, it appears on questioning that he does not do very much at all to help himself at home and lies around pretty much in bed, inactive and doing really nothing at all to take care of the children who are 4 and 6 years of age while the wife works. . . . The pain about the low back and any other paresthesias of the right lower extremity really are quite minimal according to his report today. He merely notes his medial thigh discomfort that is really not of consequence for him at this time and finds that he spends a lot of time sleeping or in bed or in a recliner, which really is just an extremely low level of activity. . . .
>
> REVIEW OF SYMPTOMS: No headaches or so he reports . . .
>
> PHYSICAL EXAMINATION: . . . Examination of the spine is really quite straight. He has a modest cervical lordosis, lumbar lordosis. No scoliosis noted. Palpation of the soft tissue about the base of the neck is really mild to minimal tenderness over the paraspinous of the cervical. There is some tenderness over the trapezium, and shoulder/neck angle, increased tenderness over the scapular stabilizer down into the lumbothoracic paraspinals with considerable tenderness, minimal discomfort over the sacroiliac area, and no gross tenderness in the gluteal masses. . . .
>
> PROBLEMS/PLAN: Diffuse myofascial pain and tenderness and mild mechanical low back pain that has been chronic.

Dr. Kent discontinued the Trazodone and the Elavil as plaintiff had stated they did not help. He added Gabitril to help sleep and control pain, increased the Neurontin, and the Baclofen, and left the Ultram prescription as it was. "Provide the wife with a work release so she can stay home, educated and take care of him, which may be in excess of what is required so we are not facilitating his sedentary inactivity."

On February 11, 2004, David Kent, M.D., at the St. John's Spine Center wrote the following on a prescription pad: "Mr. Wilson is currently incapacitated with back pain and

20

requires 24 hour assistance with personal care needs and child care from his spouse, Crystal

Wilson. This statement good for 30-day period only." (Tr. at 309).

On February 11, 2004, plaintiff saw Ramon Shane, M.D., at the St. John's Spine Center

(Tr. at 308, 365). Dr. Shane noted that plaintiff smokes a pack of cigarettes per day and had for

17 years. Plaintiff complained of numbness in his hands when his arms are above his head or

when he is picking up objects. Dr. Shane performed an arterial Doppler scan. His impression

was "There is evidence of thoracic outlet syndrome bilaterally."

On February 25, 2004, plaintiff returned to see David Kent, M.D. (Tr. at 368-370).

Portions of Dr. Kent's report read as follows:

REHABILITATION CLINIC NOTE:
. . . He feels his low back is better but it is possibly due to the flexibility, range of motion
exercises and body mechanics from physical therapy applying to this low back. They have
apparently used some traction. . . . He basically does nothing, lays around the house, and
does very little to take charge of his problem.

* * * * *

PROBLEMS AND PLAN:
1.      We have a patient with mechanical low back pain that is now improved with
        physical therapy.
2.      Myofascial pain of the shoulder, neck and paraspinals.
3.      Chronic muscle tension headaches.

PLAN: Drop the Neurontin since I do not see a true improvement in his paresthesias in
the upper extremities so will drop that and add Elavil 10 milligrams at bedtime. We
explained the reason for the Elavil to help with pain and sleep. I have asked him to
continue with the Ultracet q.i.d. [four times per day], and the Baclofen q.i.d. as
minimizing factors of change so we can evaluate progress. In addition, I asked the
physical therapist at Ozark Medical in Mountain Grove to work on cervical spine soft
tissue flexibility myofascial stretch, gentle and manual cervical traction to improve range
of motion. I also did instruct the patient and wife in supine with hip flexed and knee
flexed position lying flat on the floor to work on double chin stretching techniques to
enhance retraction of the head on the shoulders to bring the head back over the base of
the spine in a more natural plumbline instead of being protracted and positioned forward

21

now which is aggravating his muscle tension.

I went over the dynamics of the contracture of the soft tissue, the tension headaches, malpositioning of his protracted head as far forward of the center of gravity with the exercise bringing it backwards and going over the exercises with him to reinforce stretching the scalene muscles. The patient and wife seem to be somewhat pessimistic with his follow through; however, we tried to reinforce the need for him to do this three times a day and take responsibility for increasing his activity and regaining some balance in his activity.

I am going to contact a local acupuncturist here in Springfield and try to get him connected there to see if an additional pain measure may be of some help here as well.

At any rate, we are going to follow through with physical therapy hopefully to try to enhance the fourth problem of thoracic outlet which is now identified clinically plus the arterial Doppler of the upper extremities.

On March 10, 2004, plaintiff saw Stanley Hayes, M.D., a rheumatologist, at the request of Dr. Kent (Tr. at 373-374). Plaintiff complained of frequent intense pain in his neck with occipital headaches. He stated that this pain was unrelated to activity. Dr. Hayes noted that the x-rays of the cervical and thoracic spine taken at the Spine Clinic were essentially unremarkable. Dr. Hayes observed that plaintiff moved independently for aspects of the examination. Cervical spine had rotation to 50 degrees bilaterally. Thoracic spine has normal alignment. Dr. Hayes's impression was:

1.   The positive antinuclear antibody does not appear to have any clinical correlation. I would consider it unrelated to his back pain, and no other clinical illness. I would consider it a biological false positive.

2.   His symptoms and exam with respect to his back appear to be predominantly myofascial pain.

On March 17, 2004, plaintiff saw David Kent, M.D. (Tr. at 375-376). Portions of Dr. Kent's report read as follows:

22

. . .  The patient actually seems a tiny bit better today.  He is moving a bit faster, his wife says, and he thinks maybe he is a little bit more upright.  He has actually discontinued most of his medications, including Ultram, Baclofen, and the Neurontin.  Lidoderm has not been particularly helpful for him at all.  He tolerated the Elavil 10 mg at bedtime okay, though he did not seem to think that it offered him any real benefit.  He says he has tried to fish a couple of times lately.  He is being a bit more active since he has discontinued some of these medications, but he is still having difficulty, for instance, picking his child up and carrying him when he had fallen asleep on the couch and developed a lot of intrascapular pain and just could not do it, he says.

He asked again today if we can provide documentation for his spouse to be at home with him for another period of time to attend to these lifting household chores and childcare duties which he finds too difficult.

MEDICATIONS:  Basically, no medications on board at this visit.

* * * * *

IMPRESSION:
1.     Mechanical low back pain improving with physical therapy.
2.     Myofascial pain of the shoulder, neck, and paraspinals.
3.     Chronic muscle tension headaches.

PLAN:  Dr. Kent referred the patient again back to finish out his physical therapy that he has begun.  We are asking him to do some thoracic outlet relief, massage, and stretching of those myofascial trigger points in the intrascapular stabilizers.  We increased his Elavil to 25 mg at h.s. [bedtime] and encouraged him to continue with some progressive activity.  Per his request, we did provide documentation that he was seen in consultation today and we did give a note indicating that the patient's wife is required for assistance at home during the next one month as he completes his treatment in therapy.  Past that time that will not be renewed, per Dr. Kent.

On March 30, 2004, plaintiff saw Michael Ball, D.O. (Tr. at 262).  Plaintiff said his neck had been hurting for five days, "didn't take meds, no injuries".  Dr. Ball assessed cervical strain and prescribed Vicodin and Flexeril.

On April 1, 2004, plaintiff saw Michael Ball, D.O., for a follow up (Tr. at 262).  Plaintiff said he was not doing any better.  Dr. Ball assessed cervical pain and recommended an MRI due to worsening stiffness.

23

On April 15, 2004, plaintiff saw Michael Ball, D.O. (Tr. at 263). Plaintiff complained of back pain, said he had seen Dr. Kent who said he could not help plaintiff. Dr. Ball assessed cervical pain and told plaintiff to follow up with Dr. Kent and physical therapy.

On April 21, 2004, plaintiff saw David Kent, M.D. (Tr. at 380-381). Portions of Dr. Kent's report reads as follows:

> He was a bit better at the last visit. We encouraged a bit more activity, but he comes back today with a real flare up of his neck and shoulder symptoms, as well as low back symptoms. He was feeling a little bit better and helped his dad till his garden last week. He operated the tiller and he has been pretty well flared up ever since. . . . He lost his prescription for the 25 mg Elavil dosage so he took 20 mg of Elavil at bedtime for a while, but he has been out of that for at least a couple weeks. He has failed really multiple medications in part because they made him a little bit draggy. Those have included Ultram, Baclofen, Neurontin, Lidoderm patch. He is, however, asking today to try some medications again to see if we can get his acute exacerbation of symptoms settled down again. He has restarted physical therapy services which we ordered at the last visit, including stretch and massage to the intrascapular stabilizers, thoracic outlet release, and continued home stretching program.
>
> * * * * *
>
> IMPRESSION:
> 1.    Chronic myofascial shoulder and neck pain.
> 2.    Thoracic outlet syndrome.
> 3.    Chronic tension headaches.
> 4.    Mechanical low back pain.
>
> PLAN: Dr. Kent suggested referral to the chronic pain multidisciplinary program for evaluation and treatment. We are going to get him back on the Amitriptyline at bedtime 25 mg, give him some Baclofen again for this acute exacerbation anywhere from one half to one 10 mg tab three times daily, and I will have him take that along with 600 mg of ibuprofen. . . . We will have him continue physical therapy services and see him back here in the office in three weeks.

On June 12, 2004, plaintiff was seen at Cox Medical Center (Tr. at 323-331). "The patient is a 32-year-old gentleman who had just finished loading a heavy smoker into the back of a pickup. Smoker weighed somewhere between 200 and 250 pounds. With that the patient later

24

in the day started to have some back pain described as back spasm and then wrapping around to

his chest. . . . The patient is a smoker." Plaintiff's back was tender in the paraspinous muscles in

the area of the rhomboids bilaterally. The back was aggravated with any stress placed on the

rhomboids. Plaintiff was diagnosed with acute dorsal strain/rhomboid strain and was treated with

Ibuprofen and Vicodin.

On June 24, 2004, Michael Ball, D.O., completed a Residual Functional Capacity

assessment (Tr. at 312-313). Dr. Ball found that plaintiff could frequently lift ten pounds;

occasionally lift 25 pounds; stand for a total of four hours per day; sit for a total of four hours per

day; sit and/or stand a total of five hours per day; frequently push or pull with hands or feet;

occasionally climb, stoop, bend, reach, handle, finger, or feel; frequently balance, kneel, and

crouch; should avoid concentrated exposure to humidity, noise, vibration, fumes, odors, dust,

gases, and poor ventilation; avoid even moderate exposure to hazards and machinery; and avoid

all exposure to heights. In support of his findings, Dr. Ball wrote, "The information above based

on physical exam of 6-24-04 and MRI results 1-22-03 which revealed central/paracentral disc

protrusion L5/S1, and thoracic outlet exam 2-11-04, which revealed bilateral thoracic outlet

syndrome.

C.      *SUMMARY OF TESTIMONY*

During the July 8, 2004, hearing, plaintiff testified; and Terri Crawford, a vocational

expert, testified at the request of the ALJ.

1.      **Plaintiff's testimony.**

Plaintiff testified that at the time of the hearing he was 32 years of age and he is currently

35 (Tr. at 41). He has a high school education (Tr. at 41). Plaintiff is 6 feet tall and weighs 183

25

Case 6:06-cv-03040-REL   Document 20   Filed 01/29/07   Page 25 of 44

in the day started to have some back pain described as back spasm and then wrapping around to

his chest. . . . The patient is a smoker." Plaintiff's back was tender in the paraspinous muscles in

the area of the rhomboids bilaterally. The back was aggravated with any stress placed on the

rhomboids. Plaintiff was diagnosed with acute dorsal strain/rhomboid strain and was treated with

Ibuprofen and Vicodin.

On June 24, 2004, Michael Ball, D.O., completed a Residual Functional Capacity

assessment (Tr. at 312-313). Dr. Ball found that plaintiff could frequently lift ten pounds;

occasionally lift 25 pounds; stand for a total of four hours per day; sit for a total of four hours per

day; sit and/or stand a total of five hours per day; frequently push or pull with hands or feet;

occasionally climb, stoop, bend, reach, handle, finger, or feel; frequently balance, kneel, and

crouch; should avoid concentrated exposure to humidity, noise, vibration, fumes, odors, dust,

gases, and poor ventilation; avoid even moderate exposure to hazards and machinery; and avoid

all exposure to heights. In support of his findings, Dr. Ball wrote, "The information above based

on physical exam of 6-24-04 and MRI results 1-22-03 which revealed central/paracentral disc

protrusion L5/S1, and thoracic outlet exam 2-11-04, which revealed bilateral thoracic outlet

syndrome.

C.      *SUMMARY OF TESTIMONY*

During the July 8, 2004, hearing, plaintiff testified; and Terri Crawford, a vocational

expert, testified at the request of the ALJ.

1.      **Plaintiff's testimony.**

Plaintiff testified that at the time of the hearing he was 32 years of age and he is currently

35 (Tr. at 41). He has a high school education (Tr. at 41). Plaintiff is 6 feet tall and weighs 183

25

pounds (Tr. at 41). Plaintiff drove himself to the hearing (Tr. at 42). He can drive through town to run errands, but that is normally only a mile or so (Tr. at 42).

Plaintiff last worked on August 5, 2003, when he quit his job (Tr. at 42). He has no side effects from his medication (Tr. at 42).

Plaintiff had back surgery for a herniated disc which was pinching a nerve between L4 and L5 (Tr. at 43). Plaintiff had applied for disability benefits before his surgery but he could not go to the administrative hearing because he was recovering from his surgery (Tr. at 43). Plaintiff returned to work three months after his surgery (Tr. at 43). At first he did not have much trouble performing his job (Tr. at 43-44). Plaintiff was doing mechanic work on cars, trucks, and diesels (Tr. at 44). Plaintiff then began having pain in his back, and his legs were becoming weak (Tr. at 44). He worked like that for another six or seven months (Tr. at 44). His boss saw how much pain he was in, and when they would "get slow" he would send plaintiff home to rest (Tr. at 44). Plaintiff was working about 25 hours per week (Tr. at 45). Eventually plaintiff was in so much pain he could not get out of bed, so he quit his job (Tr. at 45).

Plaintiff did not file a workers compensation claim because he had been working two jobs at once and could not prove that his back injury happened at either place (Tr. at 45).

Right around the time he quit, plaintiff was extremely tired, he was walking hunched over, and he was lying down about two hours a day (Tr. at 46). If he did work a full day, he would lie down when he got home from work (Tr. at 46).

At the time of the hearing, plaintiff continued to experience pain between his shoulder which wrapped around his ribs (Tr. at 46). He has pain in his lower back and his legs, he has trouble reaching, and sometimes he cannot even pick up a gallon of milk (Tr. at 46). If he is

26

driving, his hands will go numb, so he has to drive with one hand until the other wakes up (Tr. at 47). His hand goes numb for about 30 minutes, and he also has swelling in both hands (Tr. at 47). That is from the thoracic outlet syndrome (Tr. at 47). It also causes pain under his arms and in the front of his chest (Tr. at 47). When plaintiff has the problems with hand swelling and numbness, he drops things (Tr. at 48).

Plaintiff spends most of his time trying to get comfortable (Tr. at 48). Plaintiff sleeps about three hours a night due to back pain (Tr. at 48). He is very tired during the day (Tr. at 48). He spends a total of about four hours in a recliner each day (Tr. at 49).

In April 2004, plaintiff pulled a muscle in his upper back (Tr. at 49). It hurt really bad in his upper chest and in the middle of his back, and he thought he was having a heart attack (Tr. at 49). He was air lifted to Cox South (Tr. at 49).

Plaintiff is currently being treated by Dr. Ball, but the drive back and forth to Springfield is pretty hard (Tr. at 49). Plaintiff believes he could sit for about 20 to 25 minutes at a time; he could stand for 30 minutes at a time (Tr. at 50). Plaintiff can walk about a mile back and forth to his mother's house (Tr. at 50). That takes him about 25 minutes and he stops to rest during the walk (Tr. at 50). Stooping and bending are difficult due to his severe lower back pain (Tr. at 50).

Plaintiff experiences pain in his legs when he lies down (Tr. at 51).

An average day for plaintiff includes getting up, getting dressed, and driving his wife to work (Tr. at 53). He then goes to his mother's house and visits most of the day (Tr. at 53). When plaintiff's wife gets off work, he picks her up and they go home (Tr. at 53). Plaintiff goes to his mother's because he has a four-year-old at home and his mother makes the child's lunch

27

(Tr. at 53).

Plaintiff still smokes, but is down to a half a pack per day (Tr. at 54). He is trying to quit because his father had lung surgery (Tr. at 54). His doctors have also told him that smoking can affect his back (Tr. at 54). Plaintiff did not get a TENS unit because he did not think Medicaid would pay for it (Tr. at 59).

## 2.    Vocational expert testimony.

Vocational expert Terri Crawford testified at the request of the Administrative Law Judge. The first hypothetical referred to a person who could stand and walk for a total of four hours per day; sit for four hours per day; occasionally lift 25 pounds; frequently lift ten pounds; only occasionally perform postural movements; would need to work in a climate controlled environment reasonably free of noxious fumes, dust, smoke, and lint; could not be exposed to significant unprotected heights; can climb one to three steps vertically; may not be exposed to potentially dangerous and/or unguarded moving machinery; can do no commercial driving; must work on even surfaces; must not be exposed to extreme vibration; and must be limited to simple to detailed but not complex job instructions due to possible distraction from pain (Tr. at 61-62).

The vocational expert testified that such a person could not perform any of plaintiff's past relevant work, but could be a cashier II, DOT 211.462-010, a light unskilled job with 140,000 jobs in the country and 2,800 in Missouri that would have a sit/stand option (Tr. at 62-63). The person could also work as a non-postal mail clerk which is light unskilled, DOT 209.687-026, with 230,000 jobs in the country and 5,000 in Missouri with a sit/stand option (Tr. at 63). Both of these positions would allow for a change in position as needed (Tr. at 63).

28

The second hypothetical incorporated the Medical Source Statement by Dr. Ball and involved a person who could stand for four hours, sit for four hours, and could sit and stand combined for a total of only five hours per day (Tr. at 65). The vocational expert testified that such a person could do no work (Tr. at 65).

If the person could only occasionally reach, handle, finger, or feel, the light unskilled job market would be significantly reduced to one to two percent (Tr. at 65).

D.    **STATEMENT OF CRYSTAL WILSON**

On June 24, 2004, plaintiff's wife, Crystal Wilson, provided a written statement (Tr. at 158). She had been married to plaintiff for seven years. For several years, plaintiff worked two jobs -- one for Martin Service and then he washed trucks for David Melton on the weekends. He worked seven days a week for years. Plaintiff used to love to fish, but he can no longer do that because he cannot sit or stand long enough to catch anything. Plaintiff used to pay kickball and frisbee with the kids, but since his surgery in 2002, he has not been able to do that. He can no longer carry the four-year-old. After his first disability application was denied, he went back to the same two jobs working seven days a week. His back pain got worse, and when he came home from work he would sometimes cry. He now feels worthless because he cannot work. He was recently air lifted to the hospital because he thought he was having a heart attack. It wound up being a pulled muscle in his back, and he does not know how he pulled the muscle.

V.    **FINDINGS OF THE ALJ**

Administrative Law Judge Linda Carter entered her order on August 17, 2004 (Tr. at 13-21). Using the five-step sequential analysis, the ALJ found that plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 14). She found that plaintiff suffers

29

from degenerative disc disease of the lumbar spine with evidence of disc protrusion, status post right L5-S1 discectomy; scoliosis; and thoracic outlet syndrome bilaterally, which in combination are a severe impairment (Tr. at 14). This severe impairment does not meet or equal a listed impairment (Tr. at 15).

The ALJ analyzed plaintiff's allegations and found them not credible (Tr. at 15-17). She discredited the opinions of Dr. McQueary and Dr. Ball as not being supported by the medical evidence (Tr. at 17-19). She then determined that plaintiff retains the residual functional capacity to lift 25 pounds occasionally and ten pounds frequently; sit, stand, and walk for four hours each per day; occasionally bend, stoop, crawl, crouch, and kneel; must be allowed to alternate sitting and standing positions at 30 minute intervals; limited to simple to detailed, not complex, job instructions; should not be exposed to significant unprotected heights or potentially dangerous unguarded moving machinery; should not perform any commercial driving; should work in a climate controlled environment, reasonably free of environmental irritants; and should not be exposed to extreme vibration (Tr. at 19).

The ALJ found that with this residual functional capacity, plaintiff could not return to his past relevant work (Tr. at 19). However, she found that plaintiff could perform other work available in significant numbers in the economy, that is, cashier II, and mail clerk (Tr. at 20). Therefore, plaintiff was found not disabled at the fifth step of the sequential analysis.

## VI.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

Case 6:06-cv-03040-REL    Document 20    Filed 01/29/07    Page 30 of 44

A.    CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

31

[C]laimant has had a fairly stable work history up until his alleged onset date. In terms of activities of daily living, claimant testified that he was able to care for his personal needs in the morning, and that he drove his wife to work every day. According to claimant's testimony, he then went over to his mother's home and visited with her until it was time to pick up his wife after work. Claimant further testified that he had two children, ages 7 and 4, and that he cared for the 4 year old, while the 7 year old child was in school, albeit with the assistance of his mother. He now cares for the 7 year old during the summer months.

It is noted that on an activities questionnaire completed in August 2003, claimant reported that he watched movies during the day with his children, and he read magazines and the newspaper. According to the questionnaire, claimant was able to drive an automobile, and went out daily to his mother's home wherein he reported he stayed for 3 to 5 hours. He also reported that he assisted his wife with the care of their children, and helped get the baby dressed.

. . . Overall, the undersigned finds that claimant's activities . . . are inconsistent with his allegations of disabling orthopedic pain. . . .

Although claimant has testified to disabling orthopedic pain since August 2003, the undersigned notes that claimant has had very sporadic medical treatment with respect to his alleged orthopedic complaints during the period at issue. . . .

It is further noted that although physicians of record have strongly recommended that claimant undergo physical therapy, acupuncture, and obtain a TENS unit, etc., the record and testimony indicate that claimant has not undertaken such recommended treatment or obtained a TENS unit. It is further noted that claimant has not attempted to cease smoking completely although his physicians have strongly recommended that he do so. . . .

Overall, the undersigned finds that claimant's activities of daily living, particularly with respect to his ability to care for two very young children while his wife works, his sporadic medical treatment during the period in question, and his failure to follow through with medical recommendations from his physician, with respect to cessation of smoking, physical therapy, obtainment of a TENS unit, etc., weigh heavily against claimant's allegations of a debilitating medical condition during said period. . . .

Overall, the undersigned finds nothing in the medical evidence to establish disabling physical or mental impairment(s), either singularly or in combination for claimant, which would prevent him from performing all types of competitive employment. . . . It is also noted that physicians have recommended only conservative medical treatment for claimant's orthopedic problems during the period in question, and no further surgery has been discussed or brought up by any physician of record. . . .

It was noted, on a physical therapy discharge note of August 22, 2002, that claimant's long-term goals were not met, but he was nonetheless discharged from physical therapy at that time. It is important to note that claimant, after his physical therapy discharge, returned to heavy labor-type work and continued to do so until August 2003. Although claimant, at the hearing, testified that he was unable to keep up with this labor type work because of his severe pain, and his employer would often send him home secondary thereto, the undersigned notes that there is nothing in the record to substantiate these allegations of claimant. According to the work background form claimant completed in October 2003, he performed medium to heavy labor type work at both David Melton Trucking and Martin Service Center up until August 2003, and there is no mention of any special considerations given to him by any of those two employers.

1. **PRIOR WORK RECORD**

The ALJ indicated that plaintiff had a fairly stable work history up until his alleged onset date. Therefore, this factor supports plaintiff's credibility.

2. **DAILY ACTIVITIES**

The ALJ found that plaintiff's daily activities do not support his credibility. She specifically pointed out that plaintiff was able to care for his own personal needs, he drove his wife to work every day, he drove her home every day, he visited with his mother for several hours each day, he cared for his four-year-old daily and his seven-year-old during the summer when that child was out of school, and he watches movies and reads magazines and newspapers. I also point out that in January 2004, Dr. Kent described plaintiff as a "muscular young man", which seems to suggest that plaintiff was not merely lying around all day as he alleged. Additionally, although plaintiff told Dr. Kent on March 17, 2004, that he was unable even to lift his four-year-old off the couch, a month later he was tilling his father's garden, and two months after that he was lifting a 200-250 pound smoker into the back of a pick-up truck.

Plaintiff's daily activities do not support his credibility.

3. *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

On August 9, 2002, plaintiff reported that his pain was a 2 out of 10. On August 13, 2002, he described his pain a 2 out of 10, and said that with ambulation it increases to a 3 or 4. Plaintiff continued to work, however, for another year after describing that pain.

On February 11, 2004, plaintiff told Dr. Kent that his low back pain and paresthesias of the right arm was "quite mild" and he only had thigh discomfort that was "really not of consequence". Despite having testified that he suffers from headaches, he reported on February 11, 2004, to Dr. Kent that he had no headaches.

4. *PRECIPITATING AND AGGRAVATING FACTORS*

In April 2004, plaintiff operated a tiller while helping his dad in the garden, and his back pain flared up. In June 2004, plaintiff lifted a 200 to 250 pound smoker into the back of a pick up truck. Several hours later, he began feeling pain. These precipitating and aggravating factors are outside the activities the ALJ found that plaintiff could perform while working. This factor supports the ALJ's credibility determination.

5. *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION*

In April 2003, Dr. McQueary suggested that plaintiff's back pain be "treated conservatively." He was told to do back exercises, cardiovascular exercises, and stop smoking. In August 2007, plaintiff was treated with an anti-inflammatory and a muscle relaxer. In February 2004, plaintiff told Dr. Kent that the physical therapy was making his back better.

In March 2007, plaintiff told Dr. Kent that he had discontinued most of his medications. Dr. Kent noted that plaintiff was taking no medication at all; however, his impression was "mechanical low back pain improving with physical therapy."

34

Finally, plaintiff testified that he has no side effects from his medication (Tr. at 42).

The evidence establishes that plaintiff was rarely put on anything stronger than an anti-inflammatory or a muscle relaxer, that his doctors all attempted to treat him with exercises and mild medication, and that when he did participate in physical therapy his back pain improved.

6.    *FUNCTIONAL RESTRICTIONS*

In August 2002 -- a year before plaintiff's alleged onset date -- Dr. McQueary discussed with plaintiff the fact that he may need to find a different line of work. He gave plaintiff information on vocational rehabilitation and discussed job retraining. Instead, plaintiff went back to working seven days per week (per his wife's statement) at the same two jobs requiring heavy lifting.

In April 2003, Dr. McQueary recommended that plaintiff get on a regular cardiovascular exercise program, which clearly assumes some level of functional ability.

In October 2003, a Disability Determinations physician found that plaintiff could occasionally lift 20 pounds, frequently lift ten pounds, stand or walk for at least two hours per day, sit for a total of six hours per day, and was limited in his ability to push or pull with his upper extremities. The doctor found that plaintiff could occasionally climb, stoop, crouch, and crawl, and that he could frequently balance and kneel. He had no manipulative limitations such as reaching, handling, fingering, and feeling.

In February 2004, Dr. Kent encouraged plaintiff to do his exercises three times a day and take responsibility for increasing his activity.

In March 2004, Dr. Hayes observed that plaintiff moved independently during his examination. Later that month, Dr. Kent again encouraged plaintiff to continue with progressive

35

activity. In April 2004, Dr. Kent encouraged more activity.

In June 2004, Dr. Ball, a treating physician whose opinion plaintiff argues should be adopted, found that plaintiff could frequently lift ten pounds and occasionally lift 25 pounds, although plaintiff testified he could not even lift a gallon of milk (which weighs eight pounds).

This factor supports the ALJ's credibility determination.

B.    CREDIBILITY CONCLUSION

In addition to the factors discussed above, I also note that plaintiff has been non-compliant with treatment recommendations. On July 30, 2002, plaintiff told Dr. McQueary's assistant that he was continuing to smoke (even though he had been told smoking would interfere with his back healing), he had not done any exercises from the back exercise book he was given four weeks ago, and he had been working and lifting more than his 20-pound weight restriction.

In August 2003, plaintiff asked to be discharged from physical therapy, even though his goals had not been met. He had only attended five sessions, despite having been directed by his surgeon to attend physical therapy. He continued to smoke. Eight months later, Dr. McQueary noted again that plaintiff continued to smoke. He encouraged plaintiff to completely stop smoking. In August 2003, Dr. McQueary noted that plaintiff continued to smoke. In February 2004, Dr. Shane noted that plaintiff continued to smoke a pack of cigarettes per day. In June 2004, the doctor at Cox Medical Center noted that plaintiff continued to smoke.

In September 2003, Dr. Stone advised plaintiff to go to a physiatrist and try a TENS unit and acupuncture. There is no evidence in the record that plaintiff attempted any of these recommendations. He testified that he did not obtain a TENS unit because he did not think

36

Medicaid would pay for it; however, there is no indication that he ever tried to find out whether that was the case. In October 2003, Dr. Stone again recommended physical therapy and a TENS unit. Later that month, he made the same recommendation. On October 31, 2003, a doctor at the Family Walk-in Clinic noted that plaintiff had not yet arranged to start physical therapy.

In January 2004, Dr. Kent advised plaintiff to use a soft cervical collar for comfort, but plaintiff chose not to accept the collar. In February 2004, Dr. Kent noted that plaintiff was not doing much at all to help himself at home. He agreed to write a note saying that plaintiff's wife needed to be home to take care of him but he noted that it was "in excess of what is required" and also commented that it may be facilitating plaintiff's "sedentary inactivity." In February 2004, Dr. Kent noted that plaintiff was doing very little to take charge of his problem. He recommended acupuncture, but again plaintiff never tried that treatment option. In March 2004, Dr. Kent again agreed to write a note saying that defendant's wife was needed at home during plaintiff's therapy, but he refused to renew that again after this one last time.

In April 2001, Dr. Kent noted that plaintiff lost his prescription for Elavil, so he took a different dose and then was totally out of his medication for a couple of weeks, but he did not call Dr. Kent to get a new prescription. Dr. Kent suggested referral to the chronic pain multidisciplinary program; however, there is no evidence that plaintiff ever took advantage of that. Dr. Kent had directed plaintiff to continue physical therapy and come back in three weeks; however, the record establishes that plaintiff did not return to see Dr. Kent at all.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's allegations of complete disability are not credible. Therefore, plaintiff's motion for summary judgment on this basis will be denied.

## VII.    OPINIONS OF TREATING PHYSICIANS

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinions of his treating physicians, Dr. McQueary and Dr. Ball.

## A.    DR. MCQUEARY

Plaintiff points out that Dr. McQueary, on August 7, 2003, wrote, "I would support his application for Social Security Disability, as I do not feel that there are other surgical options that we could offer him."  The ALJ noted that Dr. McQueary's report was dated April 10, 2003; however, the record establishes that the report was dated August 7, 2003 -- two days after plaintiff quit his job and eight days before plaintiff filed his application for disability benefits.

The ALJ had this to say about Dr. McQueary:

> The undersigned has carefully considered the last report from Dr. McQueary dated April 10, 2003, wherein he noted that he was supporting claimant's application for Social Security disability benefits as he did not feel [there] were other surgical options that could be offered claimant.  Overall, the undersigned finds that this comment of Dr. McQueary is not supported by any physical examination or diagnostic findings of record, and certainly not supported by that physician's own statement that he had given claimant an off work slip for three months only.  Moreover and as previously referenced, although Dr. McQueary recommended that claimant undergo other treatment modalities and possibly see a physiatrist, claimant has never followed through with such recommendations.

(Tr. at 18).

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician:

38

(1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

Dr. McQueary was an orthopaedic surgeon, which is a specialist, and he certainly had a long-term treatment relationship with plaintiff. However, plaintiff has taken Dr. McQueary's one statement about supporting his application for disability benefits completely out of context, the context being all of Dr. McQueary's records over the year he treated plaintiff and Dr. McQueary's clear displeasure with plaintiff's lack of compliance.

After plaintiff's June 5, 2002, back surgery, Dr. McQueary told plaintiff to stop smoking, do regular back exercises, and lift no more than 20 pounds at work. Plaintiff did not stop smoking, he did not do any back exercises, and he regularly lifted more than 20 pounds at work. In July 2002, plaintiff was told to begin an aggressive physical therapy program and stop smoking. At the end of the following month, it was noted that plaintiff had only been to five physical therapy sessions and then requested he be discharged, and he had not stopped smoking. Plaintiff was told to stop smoking, do his back exercises, and do cardiovascular exercises at least 20 minutes three times per week. Dr. McQueary also told plaintiff to find another line of work, and gave him information about vocational rehabilitation and job retraining. Rather than accept that medical advice, plaintiff went back to his strenuous jobs for another year, failed to participate in physical therapy, and continued to smoke.

The following April 2003, Dr. McQueary assessed that plaintiff had a back strain, but he recommended that plaintiff be treated conservatively. Plaintiff was told to begin back exercises,

39

start a regular cardiovascular exercise program, and stop smoking. This was plaintiff's last visit with Dr. McQueary before the visit resulting in the record at issue here.

On August 5, 2003, plaintiff quit his job, and two days later he went to see Dr. McQueary. Plaintiff stated that he was still smoking and he was considering applying for disability. Dr. McQueary examined plaintiff and concluded that "this is unchanged from previously." He recommended that plaintiff see a physiatrist, a doctor specializing in physical medicine and rehabilitation. He gave plaintiff samples of an anti-inflammatory and a muscle relaxer, and wrote a slip keeping plaintiff off work for three months. He then wrote that he would support plaintiff's application for disability "as I do not feel that there are other surgical options that we could offer him."

First I note that if Dr. McQueary believed that plaintiff could not perform any job for at least 12 months, which is required to win Social Security disability benefits, he would not have simply written a slip that plaintiff be off work for three months. I also note that Dr. McQueary had in the past year suggested that plaintiff train for a new job that was not as strenuous as the job he was then performing. Clearly Dr. McQueary did not believe that plaintiff was not physically incapable of performing any job. Because there was nothing more that Dr. McQueary -- an orthopaedic surgeon -- could do for plaintiff's condition, plaintiff did not again see Dr. McQueary.

And the condition from which plaintiff suffered at the time of Dr. McQueary's statement of support required nothing more than an anti-inflammatory, a muscle relaxer, and exercises.

Based on the above, I find that Dr. McQueary's own records do not support a finding that plaintiff is completely disabled from performing any job. Dr. McQueary's conclusory statement is

40

not supported by the record, and the ALJ properly discounted that statement of support.

**B.    DR. BALL**

Dr. Ball completed a Medical Source Statement in which he found that plaintiff could sit and/or stand for a total of only five hours per day, although he could sit for a total of four hours per day and stand for a total of four hours per day. He also found that plaintiff could only occasionally reach, handle, finger, and feel. All of the other findings of Dr. Ball mirror those made by the ALJ. The ALJ found that plaintiff could sit for four hours per day, stand for four hours per day, but did not find that plaintiff could only do a combination of the two for five hours per day.

The ALJ had this to say about Dr. Ball:

> It is noted herein that the undersigned has carefully considered the medical source statement of Dr. Michael Ball, claimant's treating physician, wherein he assessed some very significant restrictions on claimant's ability to work, all of which would preclude even sedentary work activity. . . .

> Overall, the undersigned finds that the opinion of Dr. Ball is wholly unsupported by any physical or neurological examination findings for claimant, and certainly not supported by claimant's sporadic medical treatment during the period in question, or his return to heavy labor-type work following his orthopedists's recommended three-month recovery period from back surgery, or his failure to follow through with medical recommendations by physicians of record, or his present level of functioning. Moreover, the undersigned notes that Dr. Ball's opinion renders an opinion on the ultimate issue of disability and inability to engage in gainful activity under the Social Security Act, all of which is reserved to the Commissioner. Accordingly, the above opinion of Dr. Ball is being accorded little weight.

(Tr. at 18-19).

Again using the same factors as those outlined above, it is clear that plaintiff had an ongoing treatment relationship with Dr. Ball, although he was not a specialist like Dr. McQueary.

41

Plaintiff began seeing Dr. Ball on January 14, 2003 -- seven months before his alleged onset date. Dr. Ball assessed lumbar strain, a diagnosis he would continue throughout his treatment of plaintiff. He prescribed an anti-inflammatory. Plaintiff had an MRI and was diagnosed with disc protrusion. However, plaintiff continued to work at the tire place and his second job washing trucks for another six months after this diagnosis. In March 2003, plaintiff told Dr. Ball that ibuprofen was not working anymore, so Dr. Ball prescribed an anti-inflammatory and a muscle relaxer. Plaintiff continued to work.

After plaintiff's alleged onset date, he did not see Dr. Ball for another four and a half months. On all of plaintiff's visits, Dr. Ball listed plaintiff's complaints, listed his assessment, and listed the medications he prescribed. There is no indication that Dr. Ball ever performed exams, ever measured plaintiff's range of motion, ever attempted to check for tenderness or spasms. I also note that plaintiff never complained of a problem with sitting or standing more than five hours per day; Dr. Ball never recommended that plaintiff limit his sitting or standing; plaintiff never complained of trouble with reaching, handling, fingering, or feeling; and Dr. Ball never recommended that plaintiff limit his reaching, handling, fingering, or feeling. Not only are there no test results to support his findings in these areas, there are not even any complaints by plaintiff about problems in these areas.

In addition to Dr. Ball's findings not being supported by his own treatment records, they are not supported by the other medical evidence. Dr. McQueary reviewed the same MRI that Dr. Ball had seen, and he found that there was no significant neurologic compression and no signs of recurrent disc herniation. Dr. McQueary, an orthopaedic specialist, found that plaintiff should be treated conservatively with back exercises. Plaintiff's July 25, 2003, x-ray of the

42

lumbar spine was negative. An August 25, 2003, x-ray of plaintiff's cervical spine was negative. Plaintiff had an MRI of his lumbar and cervical spine in September 2003, and Dr. Stone found that the MRI of the cervical spine was negative and the MRI of the lumbar spine was consistent with degenerative changes and his prior surgery. In October 2003, Dr. Stone found that x-rays of plaintiff's thoracic spine were normal. In January 2004, Dr. Kent found that plaintiff's thoracic x-rays were normal. Dr. Hayes and Dr. Kent both assessed myofascial pain and recommended exercises.

Plaintiff was not treated by any other physician with anything stronger than an anti-inflammatory and muscle relaxer, he was told to do stretching exercises for his pain, and he reported that his back was better while he was participating in physical therapy. Plaintiff was told by several doctors to try acupuncture and a TENS unit, but he chose to try neither, suggesting that his pain could not have been that bad.

Finally, I note that on August 7, 2003, plaintiff told Dr. McQueary that Dr. Ball had not even seen him, yet Dr. Ball had recorded six "visits" with plaintiff prior to plaintiff's statement that Dr. Ball did not even see him.

Based on all of the above, I find that the ALJ properly discounted Dr. Ball's Medical Source Statement as not supported by the record. Therefore, plaintiff's motion for summary judgment on the ground that the ALJ failed to give proper weight to the opinions of Dr. McQueary and Dr. Ball will be denied.

## VIII.    TESTIMONY OF VOCATIONAL EXPERT

Finally, plaintiff argues that the ALJ improperly ignored testimony by the vocational expert that plaintiff could not perform any work when the limitations of Dr. Ball's Medical

43

Source Statement were assumed.  As discussed above, the ALJ properly discredited that Medical

Source Statement.  Therefore, I find that the ALJ did not err in failing to adopt the testimony of

the vocational expert with regard to this hypothetical.

## IX.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole

supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 26, 2007

44